OPINION OF THE COURT
Judith A. Rossiter, J.
Petitioner commenced this summary proceeding on February 27, 2004, seeking possession of the premises, a warrant of evic *248 tion, and a judgment of $512 with interest, plus costs and disbursements, plus reasonable use and occupancy for the period February 1, 2004 through the date of vacation of the premises. At the hearing held on March 4, 2004 petitioner was represented by Adam Schaye of Ithaca, and respondent was represented by Alicia Plotkin of Legal Aid of Western New York, Inc. Virginia Coolbaugh testified on behalf of the petitioner. Petitioner’s exhibits 1 and 2 were marked and received into evidence as were respondent’s exhibits A through F. After evaluation of the evidence, including the testimony of the witness, the court makes the following findings:
Respondent has been a resident of Mutual Housing since December 1997. The most recent lease for the premises has the term January 1, 2003 to December 31, 2003. The terms of the lease pertinent to this action are as follows:
Lease:
“For a period of not more than one year, at which time, term can be renewed in one-year periods with the approval of the Board of Directors unless otherwise terminated by either party under the terms and conditions listed in this agreement. Approval of resident renewals by the Board can only be withheld for good cause and after compliance with the MHATC Policy and Procedures as delineated in the MHATC Resident Handbook.” (Respondent’s exhibit E.)
“4) Participation and Compliance
“a) All adult residents of each household agree, upon execution of this document, to become members of the Resident Council . . .
“d) All adult residents of each household agree, upon execution of this document, to comply with the provisions of the Bylaws of Mutual Housing Association of Tompkins County to include any and all additions and changes to said Bylaws as may from time to time be amended by the Board of Directors. By executing this document, all adult residents acknowledge receipt of the MHATC Resident Handbook and agree to comply with the provisions therein.
“e) Failure to comply with any of the provisions set forth in a, b, c, and/or d, above will constitute a breach of this agreement and will result in the termination of this agreement upon thirty days notice to Resident Member, unless a shorter period is set forth in Section 15 (Termination and Default) of *249 this document. Any violation of the provisions of this section can result in the immediate initiation of eviction proceedings . . .
“15) Termination and Default: . . .
“b) The Association may terminate this Agreement only upon failure of the Resident Member or member of resident household to comply with the terms and conditions of this Agreement:
• “For monetary default, including the failure to pay for all utilities, fees or expenses due under this Agreement
• “For non-compliance with the terms and conditions of occupancy as defined by 1) Section 6 (a) and related terms herein, 2) by the Board of Directors, and 3) by the attached Bylaws of Mutual Housing Association of Tompkins County . . .
“e) If the Resident Member wishes to terminate this Agreement at the regular yearly interval for renewal, the Resident Member must notify the Association thirty days in advance of such termination” (respondent’s exhibit E).
Resident Handbook:
“Mutual Housing Association of Tompkins County/Resident Handbook
“What is Mutual Housing Association of Tompkins County?
“Mutual Housing Association of Tompkins County (MHATC) is an affordable alternative to traditional ownership and a significant step up from rental housing. Mutual Housing Association of Tompkins County is a permanent housing resource that offers residents security of tenure, long-term affordability, a voice in the management of their housing, and an opportunity to be part of a stable community. Mutual Housing Association of Tompkins County is quality housing, built and maintained to standards that ensure long-term, multi-generational use. MHATC is recognized by the New York State Division of Housing and Community Renewal (NYSDHCR) as a Community Housing Development Organization (CDHO).
“What is a Mutual Housing Association?
“Mutual Housing Association of Tompkins County is a private, nonprofit, 501-(C) (3)-partnership organization that *250 develops, owns and manages new and existing affordable housing in the community interest. Membership is composed of mutual housing residents and potential residents, representatives of municipal and state government, and leaders from businesses and the broader community. A board of directors representative of the membership governs the association. Each board member has one vote. Mutual Housing residents and community members constitute a majority of the membership of the Board of Directors.
“Who Owns Mutual Housing Association of Tompkins County?
“The Mutual Housing Association of Tompkins County, Inc. owns all of the housing units. Although residents cannot buy or sell their units directly, they do have the pride of ownership that is usually associated with traditional home ownership. Residents have a significant voice in decision making, long-term, multi-generational use, and security of tenure based upon compliance with MHATC policies and procedures.
“Occupancy Agreement
“All residents are required to sign an annual Occupancy Agreement. This agreement is the MHATC equivalent of a lease and is so-named because of the unique relationship, structure, and responsibility of both the Mutual Housing residents and the directors and staff of MHATC. All adult residents must be named in the agreement and all pertinent information as defined by the Board of Directors is required on each occupant.
“by-laws of the MUTUAL HOUSING ASSOCIATION of TOMPKINS COUNTY, INC. . . .
“Section 10. Committees and Councils
“A. Executive Committee — There shall be an executive committee which consists of at least five (5) members of the Board, including at least one representative who is a resident of a building owned by the Mutual Housing Association of Tompkins County . . .
“During periods between scheduled Board meetings, the Executive Committee shall be empowered to act on behalf of the Board in matters requiring immediate action, as empowered by the Board. The Committee shall report its actions to the Board at its next scheduled meeting . . .
“D. Resident Councils . . .
“2. Each Resident Council shall have the right to *251 make recommendations at the Board of Directors on policies which relate to the management, operation, improvement, maintenance and related budgets of the Complex and shall have such other powers and duties as the Board of Directors may assign. The Resident Council shall monitor the operation of the Complex and the compliance with terms of resident membership and shall coordinate events and activities.
“Mutual Housing Association of Tompkins County Policy and Procedure — Resident Participation, General Responsibilities, and Conflict Resolution
“Resident Participation
“1. It is the responsibility of at least one member of each resident household (a) to participate and attend the monthly MHATC Resident Council meetings and (b) to join and participate as a member of one MHATC Committee. The Committee structures, purpose, and responsibilities are described in the Resident Handbook and are incorporated herein as if delineated in full . . .
“6. The Resident Council Executive Committee [RCEC] will evaluate the circumstances and can initiate one or more of the following actions: . . .
“d. A formal recommendation to the MHATC Board of Directors for action. This action may include a finding by the Board of a breach of the Resident Occupancy/Membership Agreement, MHATC Bylaws, and/or other rules and regulations of MHATC and the initiation of procedures for eviction.
“General Responsibilities of Residents
“1. Residents are required to comply with the provisions of the Occupancy/Membership Agreement, the MHATC By-Laws, and all other rules and regulations of MHATC to include the policies delineated herein . . .
“3. Alleged violations (other than financial) by resident members shall be reviewed by the Resident Council Executive Committee. The Resident Council Executive Committee shall direct the involved resident to appear at a time and date certain to detail the circumstances of the alleged violation to the Committee. The Resident Council Executive Committee can direct the following remedies:
*252 “a. Direct that the resident member take corrective action . . .
“b. Require a period of probation . . .
“c. Direct the resident member to meet with the Community Relations — Conflict Resolution Subcommittee.
“d. A formal recommendation to the MHATC Board of Directors for actions. This action may include a finding by the Board of Directors of a breach of the Resident Occupancy/Membership Agreement, MHATC By-laws, and/or other rules and regulations of MHATC and the initiation of procedures for eviction” (respondent’s exhibit F).
Virginia Coolbaugh, petitioner’s director of residential development, testified that petitioner elected not to renew respondent’s lease after the December 31, 2003 expiration because of an incident which occurred in November of 2003. She testified that on December 31st, she mailed respondent by certified and first-class mail, a “Landlord’s Notice to Terminate Tenancy,” which contains no reasons for termination (petitioner’s exhibit 1). She testified she also attempted to hand-deliver the notice to respondent, but there was no answer when she knocked on his door. She testified she met with respondent on January 21, and gave him a copy of the notice, which he said he had not previously received. She testified that no notice was attempted prior to the end of the term of the most recent lease, ending December 31, 2003. Respondent requested an executive committee meeting after receiving notice, but thinking that a Department of Social Services (DSS) bailout of a prior rent arrearage had solved the problem, he cancelled. The meeting was not held, nor did petitioner reschedule it. Ms. Coolbaugh testified that the actual reasons respondent’s lease was not renewed were: (1) people coming and going from his apartment, (2) numerous “police reports,” and (3) respondent threatened someone in another unit. Ms. Coolbaugh testified that respondent was not given notice of these reasons in December. Ms. Coolbaugh testified that prior to the regular Board of Directors meeting on the first Monday in February, the members of the executive committee individually recommended that the Board not renew the lease. The president of the Board signed a resolution reciting unanimous approval of nonrenewal on February 12, 2004 (petitioner’s exhibit 2).
However, in late 2003 and early 2004, petitioner also finalized a DSS bailout for the respondent for rental arrears for the *253 months of July through December 2003. The agency paid respondent $708 on January 22, 2004 in order to prevent respondent’s eviction for nonpayment. Ms. Coolbaugh sent DSS a letter on December 10, 2003, asking for $839 “in order to prevent eviction” (respondent’s exhibit A). In a letter dated January 26, 2004, Debra Reid, senior social welfare examiner, states:
“This Agency mailed, to Better Housing of Tompkins County, two checks totaling $708.00 on behalf of Joe Hawes, Jr. These checks were dated January 26, 2004, and were issued only after conversations with Ginny of Mutual Housing that this amount, plus Mr. Hawes’ payment of $132.00 would prevent his eviction. These conversations occurred between Ginny and Laura Capogrossi, Social Welfare Examiner.
“It is this Agencies [sic] policy to pay arrears only if the amount paid will prevent eviction and maintain housing.” (Respondent’s exhibit D.)
Respondent’s attorney argues that, because DSS had made the payments, Mr. Hawes cancelled the executive committee meeting because he thought the reason for the nonrenewal notice was the arrearage.
There is no evidence in the record that respondent received actual notice of the reasons for nonrenewal relied upon here by the petitioner. Prior to January 22, there was an arrearage, but the arrearage was paid in full. The matter before the court is a summary proceeding for holdover, not nonpayment. In order to determine whether respondent is holding over, the court must look to the parties’ lease. The lease provides that approval of renewals by the Board can only be withheld for good cause and after compliance with the policies and procedures contained in the handbook. According to the terms of the handbook, “[alleged violations (other than financial) by resident members shall be reviewed by the Resident Council Executive Committee. The [RCEC] shall direct the involved resident to appear at a time and date certain to detail the circumstances of the alleged violation to the Committee.” (Respondent’s exhibit F at 29.) Once this occurs, the RCEC can direct remedies, one of which is a “formal recommendation” to the Board of Directors for . action, including eviction procedures.
Petitioner argues that the RCEC is not required to follow these procedures for nonrenewal, only for termination of an *254 existing lease. At common law, lease renewals in perpetuity were not favored, but clauses conferring perpetual rights would be upheld if the parties’ intent was clearly expressed (DeSantis v Kessler, 83 AD2d 766 [4th Dept 1981]; Farone v Mintzer, 133 AD2d 1009 [3d Dept 1987]). The parties’ lease says that withholding approval for nonrenewal requires a showing of good cause after proper procedure. The policies and procedures do not distinguish between termination of an existing lease and nonrenewal, they only refer to “[a]lleged violations” (respondent’s exhibit F at 29, General Responsibilities of Residents 1f 3). The stated purpose of the Mutual Housing Association (MHA) is to provide “a permanent housing resource that offers residents security of tenure, long-term affordability, a voice in the management of their housing, and an opportunity to be part of a stable community” (respondent’s exhibit F at 2). One of the purposes of MHA is to provide housing for “long-term, multigenerational use” (id.). In addition to the lofty purposes recited in the introductory paragraphs of the Resident Handbook, the tenant has specific rights under the terms of his most recent lease with MHA. The first page of the lease incorporates, by reference, the MHA bylaws and MHA policy and procedures. Most important, the lease itself provides: “Approval of resident renewals by the Board can only be withheld for good cause and after compliance with the MHATC Policy and Procedures as delineated in the . . . Resident Handbook” (respondent’s exhibit E at 1). The policy and procedure are clear: Alleged violations are to be reviewed by the RCEC at a meeting at which the resident is directed to appear (respondent’s exhibit F at 29). At the meeting, the RCEC “will evaluate” the circumstances and make recommendations (id.). While the Board “unanimously” approved nonrenewal on February 12, 2004, there was no prior meeting at which respondent was directed to appear, nor were any findings of the RCEC presented to the court, as required by MHA policy and procedure. The MHA bylaws do not provide any powers to the RCEC or other executive committee other than those stated in the MHA policy and procedure (respondent’s exhibit F at 23-24). New York courts have reviewed the processes of corporations, unincorporated associations, and not-for-profits in order to determine if boards have followed their own bylaws and procedures (Polin v Kaplan, 257 NY 277 [1931]; Fritsch v Rarback, 199 Misc 356 [Sup Ct, NY County 1950]; Telano v Canfield, 193 AD2d 870 [3d Dept 1993]; Matter of Anderson v Board of Directors of Powelton Club, 183 Misc 2d *255 200 [Sup Ct, Orange County 1999]). As such, the corporation’s procedure is reviewable by the courts, and improper proceedings may be set aside (Polin, supra). The Supreme Court of Orange County even reviewed the procedure used to expel a country club member for a period of six weeks (Anderson, supra). The rights of the respondent here are of greater significance.
In general, a proceeding to oust a tenant whose written lease has expired may be commenced at the end of the lease term without a written notice of termination. However, in this case, the landlord has created such a requirement within its own bylaws and published procedures. Here, Ms. Coolbaugh admits these procedures were not complied with. Petitioner’s counsel conceded that, as well, during closing argument. No notice of violation was given before the end of the current lease; none of the reasons for nonrenewal were given to the respondent; no meeting was called by the RCEC. Accordingly, petitioner’s attempt to evict respondent for holdover is premature at this time. Based on the improper procedure, then, the court dismisses the petition and denies the claim for a warrant of eviction at this time.
With respect to rent, the court notes that commencement of a holdover proceeding does not put an end to respondent’s obligation to pay rent, and a landlord may collect rent after commencement of a holdover proceeding. However, case law interpreting RPAPL 711 requires either a separate nonpayment proceeding or a small claim be filed either during or after the holdover proceeding (City of Mount Vernon v Brooks, 121 Misc 2d 881 [Mount Vernon City Ct 1983]).
Although the court has indicated that this is a holdover proceeding, certain issues regarding nonpayment and the timing of a notice to vacate were raised and are now addressed. Ms. Coolbaugh testified that the January DSS check containing the money respondent owed for back rent through December 31 was retained for 27 days by MHA. She testified that she did not notify respondent that his portion of the check was returned to DSS after that time. When a landlord receives rent checks, does not return them immediately and does not explain that retention of the check was inadvertent to the tenant, courts have found such retention to vitiate or invalidate the notice of nonrenewal and termination, if the rent payment was for a period after expiration of the notice (Roxborough Apt. Corp. v Becker, 176 Misc 2d 503 [Civ Ct, NY County 1998]). The rationale is that retaining rent for a period, after the date the notice identi *256 fies as the last date of the tenancy, sends a confusing message to the tenant (id. at 504). Here, the last payment made on the apartment was for the month of December 2003 (respondent’s exhibits C, D). MHA also received payment for January 2004 from Ithaca Housing Authority under a housing assistance program contract (respondent’s answer, at 2, 1i 9). The petition recites that January rent was “returned to Section 8.” Therefore, it appears that no rent was accepted after the purported termination date of January 31, 2004. Accordingly, the court finds that acceptance of rent from DSS for the period ending December 31, 2003 did not serve to invalidate the landlord’s notice to terminate the tenancy under Roxborough (supra). However, as indicated above, the notice to quit was not issued in accordance with petitioner’s bylaws and regulations.
Finally, respondent also raised as a defense MHA’s acceptance of the DSS bailout in late December 2003 paid in order to “prevent eviction,” as stated by Ms. Coolbaugh in the December 15 letter to DSS (respondent’s exhibit B). The incident that is alleged as the basis for MHA’s decision not to renew occurred on or about November 2, 2003 (petition 11 6). However, the bailout was negotiated after MHA decided not to renew the lease, according to the petition. The landlord then attempted to serve the nonrenewal notice dated January 1, 2004 on December 31, 2003, and the petition for holdover was served February 26, 2004. The eviction proceeding was commenced despite the bailout and despite the tender of January rent under the housing assistance program contract.
Tenants have been held to be third-party beneficiaries under United States Department of Housing and Urban Development and local housing authority contracts (Mount Sinai Hosp. v Loutsch, 119 Misc 2d 427 [Civ Ct, NY County 1983]; Higgins v New York City Hous. Auth., 182 Misc 2d 728 [Civ Ct, Kings County 1999]; Reiner v West Vil. Assoc., 768 F2d 31 [2d Cir 1985]). In New York, a third person may, in his own name, enforce a promise made for his benefit even though he is not a party to the contract and paid no consideration (Mount Sinai Hosp., supra at 430). As long as the contract was intended for his benefit, he is entitled to enforce it (id.).
The court finds respondent, Joe Hawes, to be a third-party beneficiary of the bailout agreement between MHA and DSS. To base eviction proceedings on occurrences prior to the date MHA accepted the rent check, January 26, 2004, raises questions as to whether the MHA-DSS bailout agreement was based on *257 incomplete, if not misleading, information. As the court based its decision on petitioner’s lack of compliance with its own published procedures, the court need not address that question further at this point. Petition denied for the reason given herein.